**ELI LILLY & CO. v. SCHENLEY LABORATORIES, Inc.**
Civ. No. 3034.

United States District Court,
S. D. Indiana, Indianapolis Division.

May 14, 1953.

Arthur G. Connolly, Wilmington, Del., Arthur M. VanArendonk, Indianapolis, Ind., Casper W. Ooms and Dugald S. McDougal, Chicago, Ill., George B. Schley, Indianapolis, Ind., Bulleit & Orbison, New Albany, Ind., for plaintiff.

Charles A. Lowe, Lawrenceburg, Ind., for defendant.

STECKLER, District Judge.

The above entitled cause came on regularly for trial and the Court having duly considered the evidence and the post trial briefs filed by the parties, and having heard oral arguments in support thereof, and being fully advised in the premises now finds the following:

### Findings of Fact.

1. This suit is brought for infringement of United States Patent No. 2,515,898 issued July 18, 1950 to plaintiff on the application of Harley W. Rhodehamel, Jr.

2. Plaintiff Eli Lilly and Company is an Indiana corporation, and defendant Schenley Laboratories, Inc. is a Delaware corporation with a plant at Lawrenceburg, Indiana where it has committed the acts of infringement herein charged.

3. The patent in suit is entitled Procaine Penicillin and Therapeutic Compositions

and contains ten claims for solid procaine salt of penicillin and medicinal suspensions of that salt in finely divided form and specified concentrations.

4. It is admitted that the patent was issued to plaintiff and no part of plaintiff's title has been assigned.

5. Plaintiff charged defendant with infringement by the manufacture, use and sale of procaine penicillin and therapeutic compositions embodying the patented inventions covered by the claims of the patent, and defendant by its Answer admitted:

"That it has made, used and sold, and is now making and selling, therapeutic preparations of procaine penicillin-G including (a) a salt in dry form; (b) a like salt in water, in which the salt present exceeds the soluble quantity and is therefore partly in suspension, and (c) a like salt in suspension in a gelled oil. In these preparations, the procaine penicillin has a strength, when dissolved, in excess of 200,000 units per milliliter, and a particle size less than 40 mesh, and is the product of a reaction, in water solution, between procaine hydrochloride and a salt of penicillin-G."

6. The evidence establishes that defendant has made, used and sold the solid salt of procaine penicillin and the therapeutic preparations thereof described in the foregoing excerpt from its Answer.

7. No issue of infringement remained for determination by the Court.

8. Defendant's principal defense has been that the patent in suit is invalid on the ground that Rhodehamel was not the inventor of the subject matter thereof. Defendant also contends that plaintiff should be denied relief for alleged unclean hands in the prosecution of the patent application.

9. Penicillin was discovered by Fleming in 1929, and its capacity for destroying bacteria was determined before World War II. It was first produced in useful quantities during World War II and in time for its extensive use during the war, with such success that it became known as "The Wonder Drug." Penicillin development was the joint achievement of numberless scientists and the most intensive effort and wholehearted co-operation between the governments, the educational institutions, the medical institutions and the pharmaceutical industry of the Allies.

10. General civilian distribution of penicillin began in 1945 and the drug went into universal use as rapidly as the supply permitted.

11. Practical difficulties arose in the use of penicillin due to the fact that when injected into the human body penicillin was rapidly destroyed and eliminated by normal body processes and therefore remained effective for only about three hours. This required that the drug be administered at three or four hour intervals day and night throughout the period of treatment. This requirement made hospitalization or attendance of a trained nurse almost indispensable. Also, injections of penicillin were painful. In spite of these disadvantages the efficacy of the drug was so great that it remained the drug of choice and the most widely used drug in the treatment of infections.

12. The practical difficulties of administering penicillin led to extensive medical literature and resort to a number of expedients by which a therapeutically effective penicillin blood level could be maintained in the human body for an extended time to obviate the necessity for frequent painful injections.

13. Among the expedients devised for administering penicillin without the need for frequent injections were the continuous drip method whereby a penicillin solution was permitted to drip into a needle continuously positioned in the human body; the use of a tourniquet to restrict the circulation of the blood to delay elimination of penicillin; chilling parts of the body to restrict circulation; injecting penicillin into out-of-the-way parts of the body, such as behind the knee-cap, from which it slowly diffused into the circulatory system; using a clock operated syringe strapped to the body to make intermittent injections automatically; administering drugs to inhibit

normal kidney function and thereby delay penicillin excretion; and administration of penicillin in oils and emulsions.

14. The most effective expedient for the maintenance of therapeutically effective penicillin blood levels was the injection of the penicillin in a mixture of peanut oil and beeswax called "the Romansky formula." This formula generally permited once-a-day administration of penicillin and went into extensive use between 1946 and 1948, in spite of many disadvantages in the administration and use of the drug. The drug was difficult to administer. Allergic reaction to the Romansky formula was far greater than to penicillin alone, and the beeswax occasionally produced abscesses requiring surgical removal.

15. Use of the Romansky formula came practically to a complete stop in 1948 when procaine penicillin, the subject matter of the patent in suit, became generally available, and several manufacturers, including the defendant, discontinued its manufacture.

16. The problem of producing a preparation of penicillin that would permit the easy administration of the drug and the maintenance for many hours of therapeutically effective blood levels was widely recognized in the fields of medicine and the pharmaceutical manufacturing industry as a serious problem. Considerable effort was devoted to its solution from the earliest days of penicillin therapy.

17. Penicillin in drug form was usually prepared with calcium, sodium, potassium or ammonium as a dry, powdered salt. It was distributed in this dry form, but for administration it was dissolved in aqueous or oily solution. Once the penicillin had been dissolved in water, it would decompose within a few hours. The solution therefore was usually prepared shortly before administration.

18. Procaine hydrochloride, commonly also known as novocaine, is a local anaesthetic which is widely used in the medical field. Because of the great pain which frequently accompanied the injection of early penicillin, a practice developed of administering procaine with penicillin either as a separate injection or by mixing a solution of procaine with the penicillin solution and injecting the two together.

19. When solutions of penicillin were prepared, cloudiness or precipitates sometimes appeared; these phenomena sometimes occurred upon the addition of penicillin to distilled water, at times upon the addition of penicillin to normal saline, and at other times upon the addition to penicillin solutions of procaine, other local anaesthetics, or other drugs.

20. The appearance of cloudiness and precipitates in penicillin solutions led to a great number of complaints from penicillin users to the pharmaceutical manufacturers, and occasionally led to an enquiry published in the medical journals.

21. Whenever precipitated material appeared in penicillin solutions, those penicillin solutions were rejected as contaminated, and were thrown away. The phenomena engendered considerable speculation as to the cause of the precipitates; the usual explanation was to attribute them to impurities in the penicillin.

22. Nothing in the medical literature suggested that the precipitate might have been caused by a chemical reaction between the procaine hydrochloride and the penicillin salt.

23. In the laboratories of the pharmaceutical manufacturers the appearance of the precipitate was attributed to the presence of impurities in the penicillin and users were advised as to means believed effective to prevent its appearance. The manufacturers in some cases gave instructions against mixing local anaesthetics with penicillin, and in other cases recommended a particular series of steps of addition be followed which it was thought would eliminate the difficulty. In other cases users were advised to prepare the penicillin solution immediately before administration.

24. Penicillin as sold in 1945 was only about half pure. The potency of chemically pure sodium penicillin is about 1,667 units per milligram, while that of the commercial penicillin sold in 1945 was only about 800 units per milligram. Manufacturers had succeeded in improving the purity to about

1,200 units per milligram by early 1946, and by the latter half of 1946, crystalline penicillin, of between 90 to 95 per cent purity, was placed on the market. By the end of 1946 crystalline penicillin had substantially replaced the older, less pure product.

25. The Rhodehamel patent in suit is entitled Procaine Penicillin and Therapeutic Compositions and was applied for September 15, 1947. The date of invention claimed for Rhodehamel is March 31, 1947.

26. The patent in suit describes the use of penicillin and the problem created by the rapid elimination of penicillin from the human body with a resultant short duration of effective blood concentrations, and to the necessity of frequent injections. It refers to the preparation known as the Romansky formula. The patent also refers to the earlier practice of administering procaine with penicillin, both to obtain the anaesthetic effect of the procaine and to overcome the allergic reaction which penicillin occasionally produced.

27. The patent in suit describes procaine penicillin as a relatively insoluble salt which might be administered by an intramuscular injection of a suspension of the finely divided solid salt in a water or oily vehicle. The patent teaches that the use of the salt in this manner would readily maintain therapeutically effective concentrations of penicillin in the blood for twenty-four hours.

28. The patent in suit sets forth the chemistry of the production of procaine penicillin and gives specific instructions for its preparation, illustrated with twelve examples.

29. The first two claims of the patent in suit claim a solid procaine salt of penicillin, the second narrowed by the limitation that the penicillin is "Penicillin-G." Claims 3 to 10 of the patent cover therapeutic compositions of a finely divided solid procaine penicillin in a liquid suspension, the claims varying in specifying the particle size of the suspended procaine penicillin, the concentrations of the penicillin employed, and the precise suspending medium used.

30. Procaine penicillin was first offered commercially by the plaintiff and Charles Pfizer & Company in February, 1948, although a public announcement of its discovery and properties had been made the preceding October.

31. Immediately upon its commercial distribution, procaine penicillin began to displace every other type of penicillin on the market until at the time of the trial more than 70 per cent of the penicillin sold was sold in the form of the patented salt. The ratio of defendant's sales of its procaine penicillin to its total penicillin sales rose from 16.3 per cent in 1948 to approximately 80 per cent in the first five months of 1952.

32. At the close of 1947, defendant had developed a long-lasting penicillin consisting of penicillin in peanut oil and pectin and was about to enter commercial production of it. Instead, defendant began the manufacture of procaine penicillin and abandoned its other product.

33. Every manufacturer of procaine penicillin in the United States is licensed under the Rhodehamel patent by plaintiff except defendant and two others, both of whom have been sued for infringement. The licensees include Pfizer, Squibb, Bristol, Merck, Cutter, Commercial Solvents, American Home Products, Abbott, Parke-Davis and Upjohn.

34. Defendant's principal defense is based on the facts surrounding the making of the invention by Rhodehamel.

35. In March, 1947, at the Fanny Allen Hospital at Winooski, Vermont, one of the nurses reportedly, after a solution of crystalline penicillin was made in a mixture of normal saline and a one per cent solution of procaine, and after the mixture had been stored overnight in the refrigerator, noticed that in some of the vials containing the solution a grayish precipitate had appeared, although the same procedure in preparing crystalline penicillin had been followed for several months at the hospital and had not yielded any similar deposit. In a particular lot of one hundred vials the precipitate appeared in only twelve thereof.

36. This development at the Fanny Allen Hospital led to conferences among the

hospital staff, pharmacists, and chief surgeon, with the result that the practice of adding procaine to penicillin was immediately discontinued, the vials containing the precipitate were discarded, and complaints were made to at least two drug manufacturers.

37. All of the penicillin in which the precipitate had appeared had been manufactured by Charles Pfizer & Company, although the material was distributed by several different pharmaceutical manufacturers under their respective labels.

38. On March 21, 1947, the plaintiff's Vermont representative, Mr. Clark, was called to the Fanny Allen Hospital and given an account of the appearance of the precipitate in making up the penicillin and procaine solutions. He was given a specimen vial of the normal saline which had been used in making the solution, and another specimen of 20 cc. vial of 200,000 units of penicillin G dissolved in equal parts of one per cent procaine solution and normal saline in which precipitate had appeared. Mr. Clark transmitted the specimen vials to plaintiff with a report of what he had been told at the Fanny Allen Hospital. The text of his letter reads as follows:

"I was called to the above hospital this morning, the problem being a precipitate, occurring each time they made up the solutions.

"Upon checking the matter, I learned that the same condition existed when they used Upjohn's product.

"Our lot number AX-4501 manufactured by Chas. Pfizer & Co., (lot number of Upjohn's 2450, made by Chas. Pfizer & Co.).

"I am enclosing in the package with this letter,

"One envelope, Marked No. 1, in which I placed one 20 cc Vial of normal saline solution, which the hospital bottles, from bulk bottle of such solution that they prepare.

"One envelope, Marked No. 2, in which I place a 20 cc vial solution, contents which is equal parts, of 1% Solution Novocaine (this is also made up at the hospital) and normal saline. This formula is then added to the 20 cc vial of Penicillin 'G' 200,000 units. The finished solution is then placed in the refrigerator, and they claim to use such, within 24 hrs. However upon removing the vials, from the refrigerator, some were 'Clear' but crystallized, very soon, or jammed up in the syringe.

"Some vials precipitated in the refrigerator. However about 12 vials could not be used, and the balance of a carton of 100, apparently were causing no trouble, and apparently were sent out to the floors, as the sister in charge could not find the balance of the lot.

"I got the hunch that something was happening, after they mixed it, due to their own made solutions, so that is why I obtained samples so that you could examine them."

39. When the Fanny Allen complaint transmitted by Clark reached plaintiff, it passed through the usual routine for complaints and reached Dr. Walden, Director of Bio-Chemical Research, on March 31, 1947, who discussed it with several associates and delivered it, with Mr. Clark's letter, to Rhodehamel for investigation. Rhodehamel had been engaged in a research project relating to the problem of producing a long-lasting penicillin compound.

40. Rhodehamel took the specimen vial of penicillin solution containing the precipitate to his laboratory where he weighed the precipitate, determined an approximate melting point, performed an optical rotation test, and sent out some of the precipitate for a determination of its antibiotic activity. The report on its antibiotic activity was not received by Rhodehamel until some days later.

41. On the afternoon of March 31, some time after he received the complaint bottle from Fanny Allen Hospital, Rhodehamel conceived the possibility that penicillin might enter into a chemical reaction with a procaine to form a solid procaine-penicillin salt as a reaction product. That concept was original with Rhodehamel and

was not suggested by anything in the Clark letter which reported the complained-of Winooski precipitate and the manner in which it had been obtained.

42. To ascertain whether his concept had any validity, Rhodehamel on the afternoon of March 31, 1947 made a preparation of procaine base and penicillin acid in amyl acetate. By that technique Rhodehamel eliminated every factor that might contribute to the production of a solid reaction product except the particular components which he was investigating, procaine and penicillin. That preparation resulted in the formation of a white crystalline precipitate which, under the conditions of the experiment, Rhodehamel confidently believed was the solid procaine salt of penicillin. Rhodehamel conceived and disclosed that the "co-presence of excessive impurities may interfere with the formation of procaine penicillin," which was indeed contrary to the general opinion of those skilled in the art. Before Rhodehamel, even with the use of the relatively pure crystalline sodium penicillin-G, the cause of the formation of the precipitate was believed to be caused by the presence of impurities as heretofore mentioned, or the cause was unknown.

43. In the experiment which Rhodehamel conducted in the amyl acetate solvent, he selected reactants which would eliminate everything but the procaine and penicillin, the Fanny Allen complaint vial having been made up with procaine hydrochloride, normal saline or salt water, and sodium penicillin. He thus eliminated the possibility of any reaction with the salt in the saline or the hydrochloride or the metal sodium. That experiment by Rhodehamel was the first experiment in history, so far as the record discloses, in which an effort was made to produce procaine penicillin under controlled conditions and with all sources of other reaction products eliminated.

44. The precipitate which formed in the amyl acetate solvent was given melting point and optical rotation tests by Rhodehamel.

45. Following the experiment in amyl acetate solvent, Rhodehamel on the same day made a new preparation in which he mixed concentrated procaine hydrochloride and sodium penicillin in water. This solution also yielded a white crystalline precipitate, and the solution with its precipitate was stored overnight in the refrigerator. On the following morning, April 1, 1947, Rhodehamel weighed the precipitate, made solubility and optical rotation tests, and sent out a sample for a determination of anti-biotic activity.

46. The optical rotation test figure obtained by Rhodehamel for the precipitate made in the water solvent was in almost exact agreement with the optical rotation figure on the product derived from the amyl acetate solution (respectively 169.° and 169.5°).

47. On the basis of those experiments, Rhodehamel was satisfied, by the morning of April 1, 1947, that he had been correct in his conception that procaine and penicillin would react chemically together to form the solid procaine salt of penicillin as a reaction product.

48. Rhodehamel's laboratory associate, Dr. Fortune, conducted on April 1 a colorimetric test upon some of the material derived from Rhodehamel's experiment in the water solvent and determined therefrom that the full procaine molecule was present therein intact. This provided additional confirmation of Rhodehamel's concept.

49. These initial experiments were followed on subsequent days by preparations of larger quantities of solid procaine penicillin. Between March 31 and April 3 Rhodehamel conceived a potential therapeutic utility of his newly discovered penicillin salt. On April 3 toxicity tests on mice were made on samples of procaine penicillin, and within a week thereafter a sample of solid procaine penicillin G was sent by Rhodehamel to plaintiff's Dr. Chen with instructions that it be injected intramuscularly in animals in a water suspension at a concentration of 300,000 units per milliliter.

50. Thereafter plaintiff proceeded promptly and diligently with the preparation of additional quantities of procaine

penicillin in various dosage forms and used these in further tests upon animals and in clinical testing of the drug upon human beings. These tests established that a therapeutically effective penicillin blood level could be maintained in a human patient for twenty-four hours after a single injection of procaine penicillin.

51. The human clinical tests by plaintiff which followed Rhodehamel's work were conducted by employees of plaintiff before any clinical work was undertaken by any others with procaine penicillin, and before any patent application was filed by plaintiff or others on procaine penicillin.

52. The assistance which Rhodehamel received from other employees of plaintiff in the preparation of the therapeutic compositions containing procaine penicillin, covered by Claims 3 through 10, did not involve an independent invention by others but merely technical assistance in executing his own concept.

53. Water and vegetable oils have long been known in the pharmaceutical industry as suspending media, and at the time of Rhodehamel's invention were known to be equivalents for most purposes. The choice of one or the other in a specific composition did not involve invention but merely the exercise of the skill of the art.

54. The concept of procaine penicillin as a relatively insoluble salt produced by the reaction of procaine and penicillin with therapeutic utility as a long-acting penicillin compound was unknown and undisclosed until Rhodehamel reached that concept on March 31, 1947.

Dr. Walden interested himself in the precipitate which had been received in the complaint bottle from the Fanny Allen Hospital in order to know whether there was any penicillin activity in the crystals. The precipitate in the complaint bottle was an insoluble salt of something and the industry had been looking for insoluble salts. A number were engaged in a search for a relatively insoluble form of penicillin which would be free of the objectionable features of the Romansky formula. Dr. Walden was doubtful whether he made

any suggestion to Rhodehamel as to what the precipitate might be other than "it might have been an insoluble salt of penicillin." It could have been a degradation product having no penicillin activity. The Court finds that Dr. Walden's conjecture was not the kind of knowledge, the nature and contribution of which deprived Rhodehamel of originality in his concept of producing solid procaine penicillin as a reaction product. At most it was a guess, or stimulus. Theretofore such a product had been sought with the thought in mind that, as a pellet, it could be implanted in the body, slowly giving out its procaine therapeutic benefits. But the Court finds no one had conceived that the perfidiously elusive pencillin was the very thing that would react with procaine in solution to produce a long-lasting penicillin compound.

55. Rhodehamel's concept of procaine penicillin as a relatively insoluble salt produced by the reaction of procaine and penicillin with therapeutic utility as a long-acting penicillin compound was novel and original with him and constituted invention of a high order.

56. Rhodehamel was the first to have the concept of procaine penicillin as a relatively insoluble salt produced by the reaction of procaine and penicillin with therapeutic utility as a long-acting penicillin compound.

57. Rhodehamel invented procaine penicillin with his concept on March 31, 1947, and his subsequent work in producing procaine penicillin and demonstrating its therapeutic utility; and he is entitled to an invention date of March 31, 1947, for Claims 1 and 2.

58. Rhodehamel had the concept of a finely divided salt of procaine penicillin in suspension as a therapeutic agent as early as April 9, 1947, which is almost two months earlier than any such concept by any other. He is entitled to the date of April 9, 1947 as the date of invention of the subject matter of his Claims 3 through 10.

59. On May 27, 1947, two employees of Charles Pfizer & Co. made solid procaine penicillin and by June 5, 1947, recognized

that penicillin and procaine would react to form a crystalline compound of relatively low solubility. In June, 1947, Pfizer conducted laboratory tests on rabbits with procaine penicillin suspended in peanut oil to determine the blood levels obtained thereby. This was more than a month after plaintiff had made similar tests with aqueous suspensions of procaine penicillin.

60. The earliest conception of the therapeutic utility of procaine penicillin by any one at Charles Pfizer & Co. occurred in June, 1947. The first actual preparations of a therapeutic composition containing procaine penicillin suspended in oil were made by Pfizer during June, 1947, a few days before the first similar preparations were made by plaintiff but more than a month after plaintiff had made suspensions in water and administered them to animals.

61. On October 9, 1947, published reports appeared announcing that two companies, Pfizer and plaintiff (unnamed) had produced procaine salt of penicillin and stating some of the therapeutic characteristics of the salt.

62. In March, 1947, chemists of Merck & Co. had received rejected vials of penicillin dissolved in a mixture of saline solution and procaine in which a precipitate had appeared, and began a series of experiments to determine a procedure by which procaine could be used with crystalline penicillin without the appearance of a precipitate. Numerous preparations of crystalline penicillin dissolved in normal saline and procaine hydrochloride were made and observed with varying results, a few yielding a precipitate and most remaining clear under conditions which on the basis of today's knowledge should have produced solid procaine penicillin. Late in April, 1947, Merck & Co. issued standard instructions which recommended to the medical profession that procaine and penicillin could be used together without producing a precipitate by dissolving the penicillin in saline at room temperature and then adding the procaine solution. Merck's further work on mixtures of procaine and penicillin followed that of Rhodehamel by a substantial interval and not even animal tests were made with the product until after the published announcement of procaine penicillin.

63. On or after April 21, 1947, Merck chemists conceived that crystalline sodium penicillin-G could enter into a reaction with procaine hydrochloride to produce as a reaction product a solid crystalline material. This was reported by the Merck chemists to Merck's Analytical Research Department; the report suggested a formula (erroneous) for the reaction product and suggested that it might have utility as a means of assaying sodium penicillin-G. Merck's Analytical Research Department thereupon carried out a research study, working with samples of solid procaine penicillin, and on June 18, 1947 reported that the material did not possess utility as a means of analyzing the G content of crystalline penicillin or as a means of determining total penicillin. During that period of approximately two months, during which experiments with solid procaine penicillin were in progress, no one at Merck conceived or suggested the possibility that the material might possess therapeutic utility. The first suggestion from any one at Merck that solid procaine penicillin might possess therapeutic utility was made in a report dated June 23, 1947, prepared by J. A. Buck, and addressed to the manager of the Research Department. That suggestion was ignored and all work with solid procaine penicillin was thereupon abandoned, without any utility having been discovered for it. No tests directed to determining therapeutic utility of solid procaine penicillin were made by Merck until after the published announcement of procaine penicillin by plaintiff and Pfizer.

64. Although Rhodehamel filed his patent application in September, 1947, after employees of Pfizer had filed an application on June 30, 1947, Rhodehamel was the first inventor and the award of priority to him by agreement between plaintiff and Pfizer was properly made. As to Claims 1 through 8, Rhodehamel was the first to conceive the invention and the first to reduce it to practice; as to Claims 9 and 10, Rhodehamel was the first to conceive and diligent in reducing the invention to practice.

65. The later filed applications filed by chemists of Merck & Co. and Bristol Laboratories (respectively December 11 and October 26, 1947), which were also thrown into interference with Rhodehamel, were based upon work done after Rhodehamel's invention of procaine penicillin and the award of priority to Rhodehamel by the arbitrators appointed by agreement was properly made.

66. Defendant had, through 1946 and 1947, received a number of complaints of precipitates appearing in penicillin when it was mixed in solution with liver extract, thiamin hydrochloride, normal saline, glucose, other drugs and procaine.

67. At a sales meeting in September, 1946, defendant's officials discussed at great length the problem of precipitates arising in penicillin when mixed with various drugs. Several rejected vials of penicillin which had produced a precipitate upon the addition of procaine were returned to defendant in 1946 and 1947 and studied without any determination of the cause of the precipitate. One complaint, involving the return of 379 vials of penicillin in April, 1946, was submitted with samples to Harvey A. Seil, Ph.D., of the firm of Seil, Putt & Rusby, Inc., a firm of analytical, consulting and research chemists, with the request that he determine whether the precipitate "is formed as per the complaint and, if possible, why it is formed." He reported, "The Schenley salt precipitates with procaine hydrochloride—neither the Lilly or Upjohn salt precipitated."

68. Defendant's scientists detected no relationship between these precipitates and the possible reaction of procaine and penicillin until after the published notices had appeared with respect to procaine penicillin.

69. The precipitate found in the Winooski complaint sample and weighed by Rhodehamel was found to weigh 119 milligrams, which was substantially greater than the weight of solid procaine penicillin that could have been produced by the procedure reportedly testified to have been used at the Fanny Allen Hospital. The explanation of this discrepancy requires the making of a number of assumptions wholly unsupported by any evidence. Defendant has not proved that the precipitate in the Winooski complaint sample was procaine penicillin, and what proof there is, even coupled with Rhodehamel's notes with respect to the specimen, does not establish that the precipitate was procaine penicillin with the degree of proof necessary to establish the prior existence of the product under the patent law.

70. There is no proof in the record that any of the precipitates which appeared in penicillin and procaine solutions, either as reported in the medical literature or in the other exhibits in evidence, were solid procaine penicillin.

71. Nothing in the record establishes by clear and convincing proof the existence of solid procaine penicillin prior to its preparation by Rhodehamel on March 31, 1947.

72. Defendant challenges plaintiff's prosecution of the Rhodehamel application for a patent as improper on the grounds that neither the application nor subsequent correspondence with the Patent Office disclosed Rhodehamel's examination of the Winooski complaint specimen, and that the application did not contain an explicit statement with respect to possible prior art references. Defendant complains also on the ground that plaintiff filed affidavits of Rhodehamel and Dr. Leighty with respect to experiments which they had conducted with mixtures of procaine and penicillin which defendant complains were misleading.

73. The Rhodehamel patent application is in regular form and contained an accurate general statement of the condition of the art prior to Rhodehamel's invention. Had the patent application contained a complete compilation of the published art, most of which was promptly cited by the Patent Office and some of it added to the application file by plaintiff during the prosecution, and a full account of Winooski incident, none of that material would have contained any disclosure of procaine penicillin or the concept of Rhodehamel's invention.

74. The affidavits of Rhodehamel and Dr. Leighty and the remarks accompany-

ing them filed in support of the Rhodehamel application were true and clearly stated the facts which were then being presented to the Patent Office in support of the argument made in reply to the Patent Office Action. There was no misrepresentation or misconduct in the prosecution of the Rhodehamel application.

75. Defendant also complains that by settling the interferences by arbitration, plaintiff withheld from the Patent Office an opportunity to appraise the effect of Rhodehamel's access to the precipitate in the Winooski complaint sample and thereby withheld from the Patent Office critical information with respect to Rhodehamel's claim to inventorship. All of defendant's complaints with respect to the prosecution of the Rhodehamel application are based upon the assumption that the mixture of procaine and crystalline penicillin would inevitably produce solid procaine penicillin, whereas in fact the record discloses that the appearance of precipitates when such mixtures were made was sporadic and unexplained, not only prior to Rhodehamel's invention but even in controlled experiments in defendant's laboratories two months later. There was no misconduct in the settlement of the interferences.

76. Prior to Rhodehamel's invention, the appearance of precipitates in penicillin solutions, whether produced by the addition of procaine or other liquids, was baffling, mysterious, undesirable, and a source of complaint. Until Rhodehamel's invention and the work by others thereafter, these precipitates were unexplained and wholly without significance in the penicillin art.

Rhodehamel, in conjunction with other employees working with him, took the final step necessary to make a practical reality out of what others had unsuccessfully groped for, and the new compound was immediately adopted by the industry, including the defendant, and since the date of its

announcement has met with wide commercial success.

Conclusions of Law.

From the foregoing facts the Court concludes:

1. That the Court has jurisdiction over the parties and the subject matter in the cause of action.

2. The venue of this action is in the Southern District of Indiana.

3. Plaintiff is the owner of United States Letters Patent No. 2,515,898 and all rights to recover for infringement thereof.

■ 4. Defendant has infringed each of the claims of United States Letters Patent No. 2,515,898 by manufacture, use and sale of the compositions claimed therein.

5. Each of the claims of the United States Letters Patent No. 2,515,898 is valid.

6. Each of the claims of United States Letters Patent No. 2,515,898 covers a patentable invention.

[2] 7. Harley W. Rhodehamel, Jr., the applicant for United States Letters Patent No. 2,515,898, was the first and original inventor of the subject matter thereof.

■ 8. Plaintiff has not been guilty of unclean hands or inequitable conduct with respect to its procurement, enforcement or licensing of United States Letters Patent No. 2,515,898.

9. The determination of this action is governed by the Patent Act of 1952, 35 U.S.C.A. § 1 et seq. If the earlier patent statutes were applicable, the Court would enter all of the Findings of Fact and Conclusions of Law hereby entered.

10. Plaintiff is entitled to judgment ordering a permanent injunction against further infringement by defendant of United States Patent No. 2,515,898, and ordering an accounting for damages as provided by law, and an award of costs.